# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MPC Computers, LLC, *et al.*,[1] | Case No. 08-12667 (PJW) |
| Debtors. | (Jointly Administered) |

## <u>SECOND</u> AMENDED DISCLOSURE STATEMENT IN SUPPORT OF PLAN OF LIQUIDATION OF MPC CORPORATION AND ITS SUBSIDIARIES UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

REED SMITH LLP
Richard A. Robinson (No. 5059)
Kurt F. Gwynne (No. 3951)
J. Cory Falgowski (No. 4546)
1201 Market Street, Suite 1500
Wilmington, DE 19801
Telephone: (302) 778-7500
Facsimile: (302) 778-7575
E-mail:  rrobinson@reedsmith.com
             kgwynne@reedsmith.com
             jfalgowski@reedsmith.com

---

[1] The Debtors in these cases, along with the last four digits of their federal tax identification numbers are MPC Computers, LLC (6916); MPC Corporation (7562); GTG PC Holdings, LLC (6899); MPC-G, LLC (8015); MPC Solutions Sales, LLC (0213); MPC-Pro, LLC (3132); Gateway Companies, Inc. (1398); Gateway Pro Partners, LLC (9747); and Gateway Professional, LLC (8881).

THIS AMENDED DISCLOSURE STATEMENT (the "Disclosure Statement"), THE AMENDED PLAN OF LIQUIDATION OF MPC CORPORATION AND ITS SUBSIDIARIES UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE (the "Plan"), THE ACCOMPANYING BALLOTS AND RELATED MATERIALS DELIVERED HEREWITH ARE BEING PROVIDED BY THE DEBTORS TO KNOWN HOLDERS OF CLAIMS AND INTERESTS PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE IN CONNECTION WITH THE DEBTORS' SOLICITATION OF VOTES TO ACCEPT THE PLAN PROPOSED BY THE DEBTORS.

BY ORDER DATED _____, THE BANKRUPTCY COURT APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION TO PERMIT THE HOLDERS OF CLAIMS AND INTERESTS AGAINST THE DEBTOR TO MAKE REASONABLY INFORMED DECISIONS IN EXERCISING THEIR RIGHT TO VOTE ON THE PLAN. APPROVAL OF THIS DISCLOSURE STATEMENT, HOWEVER, DOES NOT CONSTITUTE A DETERMINATION ON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT AND THE RELATED DOCUMENTS SUBMITTED HEREWITH ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT. HOLDERS OF CLAIMS SHOULD NOT RELY ON ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN YOUR ACCEPTANCE OF THE PLAN THAT ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT EXCEPT AS EXPRESSLY INDICATED HEREIN. THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTORS FROM NUMEROUS SOURCES AND IS BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION AND BELIEF. HOLDERS OF CLAIMS MUST RELY ON THEIR OWN EXAMINATION OF THE DEBTORS AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED. BEFORE SUBMITTING BALLOTS, HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN, THIS DISCLOSURE STATEMENT AND ANY EXHIBITS TO BOTH DOCUMENTS IN THEIR ENTIRETY.

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M., EASTERN STANDARD TIME,_____ , UNLESS EXTENDED BY ORDER OF THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE.**

**THE DEBTORS BELIEVE THE PLAN PRESENTS THE MOST ADVANTAGEOUS OUTCOME FOR ALL THE DEBTORS' CREDITORS UNDER THE CIRCUMSTANCES OF THIS CASE AND THAT, THEREFORE, CONFIRMATION OF**

**THE PLAN IS IN THE BEST INTERESTS OF THE ESTATE. THE DEBTORS RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN BUT DOES NOT CONTAIN ALL OF ITS TERMS AND PROVISIONS. ALL PARTIES WHO ARE ENTITLED TO VOTE ON THE PLAN ARE STRONGLY ADVISED TO REVIEW THE PLAN IN ITS ENTIRETY BEFORE VOTING ON THE PLAN. TO THE EXTENT OF ANY INCONSISTENCY BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

THE DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE (IN CONJUNCTION WITH A REVIEW OF THE PLAN) WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS. HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY THEIR NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES. THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENT.

ALL CAPITALIZED TERMS IN THIS DISCLOSURE STATEMENT THAT ARE NOT OTHERWISE DEFINED HEREIN HAVE THE MEANINGS GIVEN TO THEM IN THE PLAN.

Table of Contents

                                                                            **Page**

I.      SUMMARY ................................................................................1
        A.      Plan Overview...................................................................2
        B.      Summary of Plan Treatment ...............................................2
        C.      Executory Contracts and Unexpired Leases ............................5
        D.      Voting and Confirmation ....................................................5
        E.      Risk Factors and Disclaimer ...............................................6

II.     VOTING ON AND CONFIRMATION OF THE PLAN ..........................7
        A.      Deadline for Voting For or Against the Plan ............................7
        B.      Confirmation Hearing for the Plan ........................................8
        C.      Any Objections to Confirmation of the Plan ...........................8
        D.      Recommendations for Voting ...............................................9

III.    ORGANIZATION AND ACTIVITIES OF THE DEBTORS......................9
        A.      The Debtors' Business .........................................................9
        B.      Corporate History and Structure ..........................................10

IV.     THE CASES ............................................................................15
        A.      Summary of "First Day" Motions and Orders ........................15
        B.      Appointment of Committee .................................................18
        C.      Retention of Professionals ..................................................18
        D.      Orderly Liquidation ..........................................................18
        E.      Debtor in Possession Operating Reports.................................20
        F.      Schedules and Statements of Financial Affairs ........................20
        G.      Claims Bar Date and Review Process......................................21
        H.      Litigation with Gateway, Inc. ..............................................22
        I.      Significant Pending Actions Commenced Against the Debtors ............26
        J.      Commencement of Adversary Proceedings by the Debtors and Committee........27
        K.      Administrative Claim Asserted by EMC Corporation..........................31
        L.      Tolling Agreement Relating to Potential Claims Relating to WARN Act ...........31
        M.      Current Status of the Debtors' Liquidation and Estimate Regarding Funds
                Available for Distribution ..................................................31

V.      SUMMARY OF THE PLAN ..........................................................32
        A.      Overview of Chapter 11 .....................................................32
        B.      Purpose of the Plan ...........................................................34
        C.      Classification And Treatment Of Claims And Interests ..............34
        D.      Special Provision Governing Unimpaired Claims .....................37
        E.      Acceptance And Rejection Of The Plan .................................38
        F.      Plan Implementation .........................................................38
        E.      Executory Contracts..........................................................~~49~~51
        F.      Distributions....................................................................~~51~~53
        G.      Resolution of Disputed Claims ............................................~~53~~55

| | | |
|---|---|---|
| H. | Procedures for Treating and Resolving Disputed and Contingent Claims or Interests | 5557 |
| I. | Setoffs and Recoupment | 5557 |
| J. | Cancellation of Instruments and Agreements | 5557 |
| K. | Withholding Taxes | 5557 |
| L. | Reports | 5658 |
| M. | Distribution Record Date | 5658 |
| N. | Timing and Calculation of Amounts to be Distributed | 5658 |
| O. | Settlement of Claims and Controversies | 5658 |
| P. | Retention of Jurisdiction | 5658 |
| Q. | Injunctive And Related Provisions | 5860 |
| R. | Conditions Precedent to Plan Consummation | 5961 |
| S. | Miscellaneous Provisions | 6062 |

**VI. FEASIBILITY OF THE PLAN AND THE BEST INTERESTS TEST** ... 6365
| | | |
|---|---|---|
| A. | Feasibility of the Plan | 6466 |
| B. | Best Interests Test | 6466 |
| C. | Confirmation Without Acceptance by All Impaired Classes: The 'Cramdown' Alternative | 6668 |

**VII. IMPORTANT CONSIDERATIONS AND RISK FACTORS** ... 6769
| | | |
|---|---|---|
| A. | The Debtors Have No Duty To Update | 6769 |
| B. | No Representations Outside The Disclosure Statement Are Authorized | 6769 |
| C. | Information Presented Is Based On The Debtors' Books And Records, And No Audit Was Performed | 6769 |
| D. | All Information Was Provided By Debtors And Was Relied Upon By Professionals | 6769 |
| E. | Projections And Other Forward Looking Statements Are Not Assured, And Actual Results Will Vary | 6769 |
| F. | No Legal Or Tax Advice Is Provided To You By This Disclosure Statement | 6870 |
| G. | No Admissions Made | 6870 |
| H. | No Waiver of Rights Except as Expressly Set Forth in the Plan | 6870 |
| I. | Bankruptcy Law Risks and Considerations | 6870 |

**VIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES** ... 6971
| | | |
|---|---|---|
| A. | Federal Income Tax Consequences of the Plan | 6971 |

**IX. EFFECT OF CONFIRMATION** ... 7072
| | | |
|---|---|---|
| A. | Binding Effect of Confirmation | 7072 |
| B. | Vesting Of Assets Free And Clear Of Liens, Claims And interests | 7072 |
| C. | Good Faith | 7072 |

**X. ALTERNATIVES TO PLAN** ... 7274
| | | |
|---|---|---|
| A. | Liquidation Under Chapter 7 | 7274 |
| B. | Dismissal | 7274 |
| C. | Alternative Plan | 7274 |

**XI. CONCLUSION** ...........................................................................................................~~73~~<u>75</u>

# I. SUMMARY

On the Petition Date, the following companies filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware:

- MPC Computers, LLC;
- MPC Corporation;
- GTG PC Holdings, LLC;
- MPC-G, LLC;
- MPC Solutions Sales, LLC;
- MPC-Pro, LLC;
- Gateway Companies, Inc.;
- Gateway Pro Partners, LLC; and
- Gateway Professional, LLC.

Collectively, these entities are referred to herein as the "Debtors." The principal executive offices for the Debtors were located at 906 E. Karcher Road, Nampa, Idaho 83687.

The Debtors are liquidating their assets as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

Chapter 11 of the Bankruptcy Code allows a debtor to sponsor a plan that proposes how to dispose of a debtor's assets and treat claims against, and interests in, such debtor. A chapter 11 plan may provide for a debtor-in-possession to reorganize by continuing to operate, to liquidate by selling assets of the estate or to implement a combination of both. The Plan is a liquidating plan.

## Why You Are Receiving This Document

The Bankruptcy Code requires that the party proposing a chapter 11 plan prepare and file with the Bankruptcy Court a document called a "disclosure statement." The Bankruptcy Code requires a disclosure statement to contain "adequate information" concerning the plan. In other words, a disclosure statement must contain sufficient information to enable parties who are affected by the plan to vote intelligently for or against the plan or object to the plan, as the case may be. *This document, together with any attached exhibits, is the Disclosure Statement for the Plan. The Bankruptcy Court has reviewed this Disclosure Statement and has determined that it contains adequate information and may be sent to you to solicit your vote on the Plan.*

This Disclosure Statement summarizes the Plan's content and provides information relating to the Plan and the process the Bankruptcy Court will follow in determining whether to confirm the Plan. The Disclosure Statement also discusses the events leading to the Debtors' filing their Chapter 11 Cases, describes the main events that have occurred in the Debtors' Chapter 11 Cases, and, finally, summarizes and analyzes the Plan. The Disclosure Statement also describes voting procedures and the confirmation process.

*All Creditors should carefully review both the Disclosure Statement and the Plan before voting to accept or reject the Plan. Indeed, Creditors should not rely solely on the Disclosure Statement but should also read the Plan. Moreover, the Plan provisions will govern if there are any inconsistencies between the Plan and the Disclosure Statement.*

A.    Plan Overview

1.    Purpose - Liquidation

The purpose of the Plan is to conclude the Debtors' orderly liquidation of assets and govern distributions to creditors. If the Plan is not confirmed, the Debtors believe that they will be forced either to liquidate under Chapter 7 of the Bankruptcy Code of dismiss their bankruptcy Cases. In either event, the Debtors believe that the Debtors' unsecured creditors would receive smaller distributions, or, in certain cases, none at all, for their Claims.

2.    Substantive Consolidation or Merger

On the Effective Date, the Debtors' estates will be substantively consolidated pursuant to section 105(a) of the Bankruptcy Code for the limited purposes of allowance, treatment and distributions under the Plan. As a result of the substantive consolidation, on the Effective Date, all property, rights and claims of the Debtors shall be deemed pooled for purposes of allowance, treatment and distributions under the Plan. As an alternative to limited substantive consolidation, the Debtors may effectuate a merger under applicable nonbankruptcy law.

B.    Summary of Plan Treatment

| Unclassified Claims | Plan Treatment |
|---|---|
| Administrative Claims:2 | *Non-Professional Fee Claims*<br>Each Holder of an Allowed Administrative Claim (excluding Professional Fee Claims) shall receive the full amount of such Allowed Administrative Claim, without interest, in Cash, as soon as practicable after the later of: (i) the occurrence of the Effective Date, or (ii) the date such Administrative Claim becomes an Allowed Claim. Notwithstanding anything in the Plan to the contrary, a Holder of an Allowed Administrative Claim may be paid on such other date or dates and upon such other less favorable terms as may be |

---

2    "Administrative Claim" means a Claim for costs and expenses of administration under section 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, but not limited to: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors (including wages, salaries or commissions for services and payments for goods and other services and leased premises); (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under sections 328, 330(a) or 331 of the Bankruptcy Code or otherwise; and (c) all fees and charges assessed against the Estates under chapter 123 of Title 28 United States Code, 28 U.S.C. §§ 1911-1930.

| Unclassified Claims | Plan Treatment |
|---|---|
| | agreed upon by such Holder and the Liquidating Trustee.  Without limiting the foregoing, all outstanding fees payable to the Office of the United States Trustee under 28 U.S.C. § 1930 that have not been paid as of the Effective Date, shall be paid by the Liquidating Trustee no later than thirty (30) days after the Effective Date, or when due in the ordinary course, pending entry of a Final Decree. |
| | *Professional Fee Claims*<br>The Liquidating Trustee shall pay Professionals who are entitled to reimbursement or allowance of fees and expenses from the Debtors' Estates pursuant to Bankruptcy Code §§ 503(b)(2) - (b)(6), in Cash, in the amount awarded to such Professionals by Final Order of the Bankruptcy Court, as soon as practicable after the later of (i) the Effective Date, and (ii) the date upon which any order awarding fees and expenses becomes a Final Order, in accordance with the terms of any order entered by the Bankruptcy Court governing the payment of fees and expenses during the course of the Chapter 11 Case, and after application of any retainer received by the Professionals. |
| Priority Tax Claims | The Disbursing Agent shall pay each Holder of an Allowed Priority Tax Claim in full, in Cash, as soon as practicable after the later of (i) the Effective Date, or (ii) the date such Priority Tax Claim becomes an Allowed Claim.  All Allowed Priority Tax Claims against the Debtors that are not due and payable on or before the Effective Date, shall be paid in the ordinary course of business in accordance with the terms thereof.  The Liquidating Trustee can prepay any Allowed Priority Tax Claim at any time after the Effective Date, without any penalty or charge.<br><br>Holders of Allowed Priority Tax Claims will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with such Claims.  Any Claim for any such penalty, or demand for any such penalty, will be deemed disallowed by confirmation of the Plan. |

| Class | Claim | Plan Treatment of Class |
|---|---|---|
| 1 | Other Priority Non-Tax Claims | As soon as practicable after the later of (i) the Effective Date, or (ii) the date on which the Other Priority Non-Tax Claim becomes an Allowed Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Other Priority Non-Tax Claim that is due and payable, the Disbursing Agent shall pay each Holder of an Allowed Class 1 Claim, in relative order of priority pursuant to Bankruptcy Code § 507, in full, in Cash, without interest.<br>**Class 1 is unimpaired and is deemed to accept.** |

| Class | Claim | Plan Treatment of Class |
|-------|-------|-------------------------|
| 2 | Gateway Secured Claims | ~~The~~In accordance with the Gateway Settlement Agreement, the Holders of Class 2 Claims shall be entitled to receive 45% of the net proceeds (less any and all costs of collection including reasonable attorneys' fees) of accounts receivable of MPC-Pro, obtained from May 31, 2010 until the date of entry of a final decree in the cases of each of the Debtors, which amounts shall be applied to further reduce the Gateway Deficiency Claim. **Class 2 is impaired and is entitled to vote.** |
| 3 | Other Secured Claims that are not Class 1 or 2 Claims | On the Effective Date or as soon as practicable thereafter, each Holder of an Allowed Other Secured Claim that is not a Class 2 Claim (e.g. PMSI Holders, equipment financing lenders, etc.) shall receive one of the following treatments, at the option of the Liquidating Trustee, such that they shall be rendered unimpaired pursuant to section 1124 of the Bankruptcy Code: (i) the payment of such Holder's Allowed Other Secured Claim in full, in Cash; (ii) the sale or disposition proceeds of the property securing such Allowed Other Secured Claim to the extent of the value of the Holder's interests in such property; or (iii) the surrender to the Holder of the property securing such Claim.<br><br>The Debtors do not believe that there will be any Allowed Class 3 Claims.<br><br>**Class 3 is unimpaired and is deemed to accept.** |
| 4 | Class 4 General Unsecured Claims | On the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed Class 4 Claim shall receive its Pro Rata share of Distributable Cash.<br><br>**Class 4 is impaired and is entitled to vote.** |
| 5 | Interests | On the Effective Date, all Interests shall be deemed cancelled and of no further force and effect, whether surrendered for cancellation or otherwise.<br><br>**Class 5 is not entitled to receive or retain any property under the Plan and therefore is deemed to reject.** |
| 6 | Intercompany Claims | Class 6 Claims receive no distribution and Class 6 Claims are cancelled as of the Effective Date.<br><br>**Class 6 is not entitled to receive or retain any property under the Plan and therefore is deemed to reject.** |
| 7 | Other Securities Claims and Interests | Class 7 Claims receive no distribution and are cancelled and discharged as of the Effective Date.<br>**Class 7 is not entitled to receive or retain any property under the Plan and therefore is deemed to reject.** |

**THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE BANKRUPTCY COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON ALL CLAIM AND INTEREST HOLDERS.**

C.      Executory Contracts and Unexpired Leases

On the Confirmation Date, except for (i) any Executory Contract that was previously assumed or rejected by an order of the Bankruptcy Court pursuant to Bankruptcy Code § 365, and (ii) any Executory Contract identified on the Assumption Schedule, each Executory Contract that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to Bankruptcy Code §§ 365 and 1123, effective as of the Confirmation Date.

Except to the extent another Bar Date applies pursuant to an order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts under the Plan must be filed with the Court, and a copy served on counsel for the Debtors and the Liquidating Trustee, within thirty (30) days of the Effective Date

D.      Voting and Confirmation

Each Holder of a Claim in Class 2 and/or Class 4 will be entitled to vote either to accept or reject the Plan. Class 2 and/or Class 4 shall have accepted the Plan if: (i) the Holders of at least two-thirds in dollar amount of the Allowed Claims actually voting in each such Class have voted to accept the Plan and (ii) the Holders of more than one-half in number of the Allowed Claims actually voting in each such Class have voted to accept the Plan. Assuming the requisite acceptances are obtained, the Debtors intend to seek confirmation of the Plan at the Confirmation Hearing scheduled to commence on _____ before the Bankruptcy Court.

Article II of this Disclosure Statement specifies the deadlines, procedures and instructions for voting to accept or reject the Plan and the applicable standards for tabulating Ballots. The Bankruptcy Court has established _____, (the "Voting Record Date") as the date for determining which Holders of Claims are eligible to vote on the Plan. Ballots will be mailed to all registered Holders of Claims as of the Voting Record Date who are entitled to vote to accept or reject the Plan. An appropriate return envelope will be included with your Ballot, if necessary.

The Debtors have engaged the Solicitation Agent to assist in the voting process. The Solicitation Agent will answer questions, provide additional copies of all materials and oversee the voting tabulation. The Solicitation Agent will also process and tabulate ballots for each Class entitled to vote to accept or reject the Plan. The "Solicitation Agent" is Logan & Company, Inc., 546 Valley Road, Upper Montclair, New Jersey 07043, (973) 509 – 3190.

E.      Risk Factors and Disclaimer

Prior to deciding whether and how to vote on the Plan, each Holder of a Claim should carefully read this Disclosure Statement, with all attachments and enclosures, in its entirety, in

order to formulate an informed opinion as to the manner in which the Plan affects their Claim(s) against the Debtors and to determine whether to vote to accept the Plan. Holders of Claims should particularly consider the risk factors described in Article VII hereof.

Holders of Claims should also read the Plan carefully and in its entirety. The Disclosure Statement contains a summary of the Plan for convenience, but the terms of the Plan, itself, supersede and control the summary.

In formulating the Plan, the Debtors relied on financial data derived from their books and records. The Debtors therefore represent that everything stated in this Disclosure Statement is true to the best of their knowledge. The Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.

**Nothing contained in this Disclosure Statement is, or shall be deemed to be, an admission or statement against interest by the Debtors for purposes of any pending or future litigation matter or proceeding.**

**Although the attorneys, accountants, advisors and other professionals employed by the Debtors have assisted in preparing this Disclosure Statement based upon factual information and assumptions respecting financial, business and accounting data found in the books and records of the Debtors, they have not independently verified such information and make no representations as to the accuracy thereof. The attorneys, accountants, advisors and other professionals employed by the Debtors shall have no liability for the information in this Disclosure Statement.**

**The Debtors and their professionals also have made a diligent effort to identify in this Disclosure Statement and in the Plan pending litigation claims and projected Causes of Action and objections to Claims. However, no reliance should be placed on the fact that a particular litigation Claim or projected Cause of Action or objection to Claim is, or is not, identified in this Disclosure Statement or the Plan. The Debtors or Liquidating Trustee, as applicable, may seek to investigate, file and prosecute litigation Claims and projected Causes of Action and objections to Claims after the Confirmation Date or Effective Date of the Plan irrespective of whether this Disclosure Statement or the Plan identifies any such Claims, Causes of Action or objections to Claims.**

## II.    VOTING ON AND CONFIRMATION OF THE PLAN

### A.    Deadline for Voting For or Against the Plan

If one or more of your Claims is in a voting Class, the Debtors' Solicitation Agent, has sent you one or more individual Ballots, with return envelopes (WITHOUT POSTAGE ATTACHED) for voting to accept or reject the Plan. The Debtors urge you to accept the Plan by completing, signing and returning the enclosed Ballot(s) in the return envelope(s) (WITH POSTAGE AFFIXED BY YOU) to the Solicitation Agent as follows:

> If sent by U.S. Mail, courier service, overnight
> or hand delivery:
>
> Logan & Company, Inc., Balloting Agent
> 546 Valley Road
> Upper Montclair, New Jersey 07043

TO BE COUNTED, THE SOLICITATION AGENT MUST RECEIVE YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN **NO LATER THAN 5:00 P.M., PREVAILING EASTERN TIME, ON**_____ (THE "VOTING DEADLINE"), UNLESS THE BANKRUPTCY COURT EXTENDS OR WAIVES THE PERIOD DURING WHICH VOTES WILL BE ACCEPTED BY THE DEBTORS, IN WHICH CASE THE TERM "VOTING DEADLINE" FOR SUCH SOLICITATION SHALL MEAN THE LAST TIME AND DATE TO WHICH SUCH SOLICITATION IS EXTENDED. ANY EXECUTED BALLOT OR COMBINATION OF BALLOTS REPRESENTING CLAIMS IN THE SAME CLASS HELD BY THE SAME HOLDER THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR THAT INDICATES BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN SHALL NOT BE COUNTED. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE MAY NOT BE COUNTED AT THE DISCRETION OF THE DEBTORS AND THE COMMITTEE.

Detailed voting instructions are printed on and/or accompany each Ballot. Any Ballot sent by mail must be received by the Solicitation Agent at the appropriate address set forth above by no later than 5:00 p.m. Eastern Time on the Voting Deadline. Any Ballot sent by any other means must be physically received by the Solicitation Agent by the Voting Deadline or it shall not be counted. Any unsigned Ballot or any Ballot that has no original signature, including any Ballot received by facsimile or other electronic means, or any Ballot with only a photocopy of a signature shall not be counted. Any Ballot that is not clearly marked as voting for or against the Plan, or marked as both voting for and against the Plan, shall not be counted. Any Ballot that is properly completed and timely received shall not be counted if such Ballot was sent in error to, or by, the voting party, because the voting party did not have a Claim that was entitled to be voted in the relevant Voting Class as of the Voting Record Date. Whenever a Holder of a Claim in a Voting Class casts more than one Ballot voting the same Claim prior to the Voting Deadline, the last Ballot physically received by the Solicitation Agent or a Nominee, as the case may be, prior to the Voting Deadline shall be deemed to reflect the voter's intent and thus shall supersede and replace any prior cast Ballot(s), and any prior cast Ballot(s), shall not be counted. The

Debtors, in consultation with the Committee, without notice, subject to contrary order of the Court, may waive any defect in any Ballot or Master Ballot at any time, either before or after the close of voting, and without notice. Such determinations will be disclosed in the voting report and any such determination by the Debtors and the Committee shall be subject to de-novo review by the Court.

On November 19, 2009, the Debtors filed their original Plan and Disclosure Statement. Subsequently, on January 21, 2010, the Debtors filed their Motion for an Order (I) Approving Disclosure Statement, (II) Establishing Voting and Vote Tabulation Procedures, (III) Establishing Confirmation Hearing Date and Deadline for Objections to Plan, and (IV) Approving Solicitation Package and Procedures (the "Solicitation Motion").

On December 3, 2010, the Debtors filed ~~this~~their Amended Disclosure Statement and their Amended Plan. On December 16, 2010, the Debtors filed this Second Amended Disclosure Statement and their Second Amended Plan. On December _____, 2010, the Bankruptcy Court entered its Order granting the relief requested in the Solicitation Motion (the "Solicitation Order"), which, among other things, approved the voting procedures addressed herein. You should carefully read the Solicitation Order, which is annexed hereto as Exhibit __. It establishes, among other things: (a) the deadlines, procedures and instructions for voting to accept or reject the Plan; (b) the Voting Record Date, which is _____, (c) the applicable standards for tabulating Ballots; (d) the deadline for filing objections to Confirmation of the Plan; and (e) the date and time of the Confirmation Hearing (also set forth below).

The Solicitation Order should be referred to if you have any questions concerning the procedures described herein. If there are any inconsistencies or ambiguities between this Disclosure Statement and the Solicitation Order, the Solicitation Order will control.

B.    Confirmation Hearing for the Plan

The Bankruptcy Court has set a hearing on the Confirmation of the Plan (the "Confirmation Hearing") to consider objections to Confirmation, if any. The Confirmation Hearing shall commence at _____ _.m., **Prevailing Eastern Time** on _____, **2011**, in the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Wilmington, Delaware 19801. The Confirmation Hearing may be continued from time to time, without notice, other than an announcement of a continuance date at such hearing or a continued hearing, or by posting such continuance on the Court's docket.

C.    Any Objections to Confirmation of the Plan

Any responses or objections to Confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court with a copy to the Court's Chambers, together with a proof of service thereof, and served on counsel for the Debtors, counsel for the Committee and the Office of United States Trustee **ON OR BEFORE** _____, **2011** at **4:00 P.M., Prevailing Eastern Time**. Bankruptcy Rule 3020 governs the form of any such objection.

**Counsel on whom objections must be served are:**

Counsel for the Debtors
Reed Smith LLP
1201 Market Street, Suite 1500
Wilmington, DE 19801
Attn:  Richard A. Robinson, Esq.
       Kurt F. Gwynne, Esq.
       J. Cory Falgowski, Esq.

Counsel for the United States Trustee
Office of the United States Trustee
844 N. King Street, Second Floor
Wilmington, DE 19801
Attn:  Jane Leamy, Esq.
Counsel for the Official Committee of
Unsecured Creditors
Hahn & Hessen, LLP
488 Madison Avenue
New York, NY 10022
Attn:  Mark Indelicato, Esq.
       Katharine Craner, Esq.
       Nicholas Rigano, Esq.

D.     Recommendations for Voting

The Debtors strongly recommend that you vote in favor or the Plan.  Nonacceptance of the Plan may result in protracted delays, a chapter 7 liquidation or the confirmation of another less favorable chapter 11 plan.  These alternatives may not provide for distribution of as much value to Holders of Allowed Claims as does the Plan.  The Debtors believe that unsecured creditors will receive a greater distribution under the Plan than they would in a chapter 7 liquidation, as more fully discussed below.

THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF ALL OF THEIR CREDITORS AS A WHOLE.  THE DEBTORS THEREFORE RECOMMEND THAT ALL HOLDERS OF CLAIMS SUBMIT BALLOTS TO ACCEPT THE PLAN.

## III.    ORGANIZATION AND ACTIVITIES OF THE DEBTORS

A.     The Debtors' Business

The Debtors' primary business was providing PC-based products and services to mid-sized businesses, government agencies and educational organizations.  The Debtors' focus enabled them to tailor their operating models to better support the needs of customers for customized products, services and programs.

The Debtors sold directly to their customers and used a build-to-order manufacturing process that was an efficient means to provide customized computing solutions, including desktop personal computers ("PCs"), notebook PCs, servers and storage products. Among others, the Debtors manufactured and marketed such products as ClientPro desktop PC, TransPort notebook PCs, NetFRAME servers, DataFrame storage products, as well as the "E-series" of desktops, notebooks, servers and storage products under a limited license agreement with Gateway, Inc. ("Gateway"). The Debtors' PCs garnered numerous industry awards. In addition to PCs, servers and storage products, the Debtors fulfilled customers' requirements for third-party products produced by other vendors, including peripherals and software.

The Debtors' revenues were approximately $249 million for the six months ended June 30, 2008, $365 million in 2007 and $285 million in 2006.

B.     Corporate History and Structure

    1.     Corporate Structure

MPC Corporation is a Colorado corporation and holding company that wholly owns GTG PC Holdings, LLC and MPC-Pro, LLC.

GTG PC Holdings, LLC wholly owns MPC Computers, LLC, which wholly owns both MPC-G, LLC and MPC Solutions Sales, LLC.

MPC-Pro, LLC wholly owns Gateway Companies, Inc., a Delaware corporation, which wholly owns Gateway Pro Partners, LLC and Gateway Professional, LLC. All of the Debtors other than MPC Corporation and Gateway Companies, Inc. are single member Delaware limited liability companies.

The Debtors were initially formed as HyperSpace Communications, Inc. ("HyperSpace"), and completed an initial public offering in October 2004. Thereafter, in July 2005, HyperSpace acquired MPC Computers, LLC as a wholly owned subsidiary. In January 2007, HyperSpace changed its name to MPC Corporation.

On May 8, 2008, the American Stock Exchange ("AMEX") notified MPC Corporation ("MPC") that it was not in compliance with certain provisions of the AMEX Company Guide. On June 9, 2008, MPC submitted a plan of compliance to AMEX and AMEX thereafter notified the Debtors that the plan of compliance was accepted and gave the Debtors an extension until November 9, 2009 to regain compliance. During the extension period MPC remained subject to periodic review by AMEX and to delisting procedures if it failed to make progress consistent with the proposed plan. On October 21, 2008, MPC received notice that AMEX would be submitting a delisting application to the Securities and Exchange Commission based on a review of publicly available information, information provided by MPC and its determination that MPC did not demonstrate a reasonable ability to regain compliance with the continued listing standards.

MPC Corporation has 626,546 issued and outstanding Series A Preferred shares, 249,171 issued and outstanding Series B preferred shares and 35,244,349 issued and outstanding common shares.

On September 6, 2006, the Debtors entered into a securities purchase agreement with certain existing investors and new investors pursuant to which they sold convertible debentures for an aggregate of $4.6 million. Additionally, the certain prior investors exchanged $5.0 million face value of their convertible debentures plus $226 thousand of accrued interest thereon into the New Convertible Debentures and the existing and new investors received 4,924,500 warrants. The aggregate principal amount became due and payable September 6, 2009.

On September 29, 2006 the Debtors entered into a securities purchase agreement with certain existing investors and new investors pursuant to which the Debtors agreed to sell convertible debentures for an aggregate of $4.9 million. The majority of the transaction closed October 4, 2006. The debentures became convertible into shares of common stock at a conversion price of $0.75 per share, and accrue interest at 8% per annum with the aggregate principal amount due and payable on September 29, 2009. The investors also received an aggregate of 2,468,125 warrants to purchase common stock, which allowed the purchase of common stock for $1.10 per share and were for a term of 5 years.

2.     Events Leading to the Debtors' Bankruptcy Filing

    (a)     The Gateway Acquisition

On October 1, 2007 MPC Corporation, through its wholly owned subsidiary MPC-Pro, purchased Gateway's Professional Division, which marketed business-related products, and a portion of the Customer Care & Support department, which provided technical services to customers of the Professional and Consumer Direct Divisions (collectively, the "Professional Business"). The Professional Business was primarily engaged in the sale, resale and marketing of desktop computer systems, laptops, servers, networking gear and other peripherals, and replacement parts to educational institutions, government entitles, and value-added resellers. As part of the acquisition, the Debtors assumed operations of Gateway's final assembly facility in Nashville, Tennessee. This acquisition significantly increased the scale of the Debtors' business as Gateway's Professional Business had reported revenues of approximately $895 million in 2006 as compared to the Debtors' revenue of approximately $285 million for 2006. The Gateway Acquisition substantially increased the Debtors' operating costs and expenses, but did not have a commensurate impact on revenue or profitability.

Contemporaneously with the acquisition of the Professional Business, MPC-Pro and Gateway entered into a Transition Services Agreement ("TSA"). Under the TSA, Gateway provided accounting, human resources, manufacturing, procurement, marketing, information technology and other specified services to the Debtors for the six (6) months ending June 30, 2008. The terms of the TSA obligated the Debtors to make certain scheduled periodic payments to Gateway, with the balance fully payable in November 2008. The Debtors were unable to make certain of the required payments under the TSA and expected to renegotiate the TSA in August 2008 to further defer payment to Gateway. As of the Petition Date, Gateway asserts that it is owed approximately $13.9 million under the TSA, plus an additional amount of approximately $2 million relating to unpaid invoices.

The TSA also required Gateway to undertake certain buy/sell activities related to components on behalf of the Debtors, including procuring components from suppliers, selling

such components to original design manufacturers ("ODMs") for manufacture of finished goods that are ordered from ODMs by Gateway, and thereafter selling the finished goods to MPC–Pro (the "Buy/Sell Activity"). During the six months ended June 30, 2008, payments to Gateway pursuant to the Buy/Sell Activity and purchases of component inventory totaled approximately $22.0 million. As of June 30, 2008 accounts payable to Gateway for the Buy/Sell Activity, inventory purchases and related services totaled approximately $14.1 million.

The Debtors began the transition of the Professional Business IT and manufacturing systems from Gateway to MPC Computers' existing systems in February 2008. During the transition, the Debtors experienced material delays in manufacturing and customer deliveries, as well as material delays in deliveries of parts needed for service and support related matters which resulted in much lower than expected shipment volumes and revenues for the first quarter of 2008. These delays were the result of, among other things, inaccurate bills of materials for the manufacturing process, inadequate inventory procurement, routing problems which resulted in a parts shortage, and order entry errors that resulted in certain orders being delayed. As a result of the manufacturing delays, the Debtors experienced limited and stopped production at the Nashville facility over an approximately three week period.

At this time, the Debtors were also in the process of moving the manufacture of portable PCs from their operations in China to the Nashville facility, which caused the transition-related issues to have a more pronounced effect. The Debtors failed to anticipate any transition related delays and, as a result, procured excessive amounts of raw material inventory. As a result, the Debtors' finished goods inventory increased from $15.4 million as of December 31, 2007 to $24.2 million as of June 30, 2008.

During the first quarter of 2008, while still dealing with the various Gateway transition problems, the Debtor's ability to secure peripheral products, including monitors, speakers, and keyboards, from third party vendors was also diminished as a result of certain of the Debtors' vendors changing their procurement policies. As a result, deliveries to customer support and service areas were delayed, which resulted in the Debtors needing to procure additional parts to support customer needs. Further, certain replacement parts did not reach customers in a timely manner. These delays in manufacturing and customer deliveries as well as the various service and support issues caused the Debtors' inventory and accounts payable to grow materially during the Gateway transition and during the first six (6) months of 2008.

*(b)     The Flextronics Manufacturing Services Agreement*

In April of 2008, the Debtors made the decision to cease manufacturing operations in Tennessee and to outsource a large portion of their manufacturing to a third party provider so that they could focus sales, marketing, product development and support functions. On April 14, 2008, MPC and Flextronics Computing Mauritius Limited ("Flextronics") entered into a Manufacturing Services Agreement (the "MSA"), pursuant to which Flextronics agreed to perform procurement, supply chain management, manufacturing, assembly, and testing for MPC. As a result of this transition, the Debtors reduced their workforce by approximately 145 personnel at the Nashville facility.

On May 8, 2008, Gateway Pro Partners, LLC ("GPP") entered into an Inventory Purchase Agreement (the "IPA") with Flextronics, pursuant to which Flextronics could purchase certain inventory located at the Nashville facility and GPP would thereafter repurchase such inventory over the following 90 day period. After the expiration of the 90 day period, GPP was required to purchase any remaining inventory. In consideration for the IPA, GPP paid Flextronics a monthly management fee as well as interest at 1.5% per month on the outstanding inventory not repurchased.

The outsourcing of the manufacturing operations to Flextronics was designed to achieve certain manufacturing and overhead savings. Flextronics had a larger scale of operations than the Debtors, enabling them to procure products and components at lower prices and with lower labor costs. Pursuant to the MSA, Flextronics agreed to adhere to a timeline associated with the manufacturing operations at its facility in Juarez, Mexico. The transition of manufacturing operations by Flextronics proceeded slower than planned, and as of August 2008 limited amounts of finished products had been produced by Flextronics. By August 2008 the Nashville facility was shut down and a substantial portion of the Debtors' inventory was moved or in transit to the Flextronics Juarez facility.

As a result of various transition issues with Flextronics, the Debtors' liquidity was materially impacted and their working capital substantially deteriorated from December 31, 2007 through and into the third quarter of 2008. Further, as a result of production delays, orders in backlog were cancelled and there was an overall decline in sales. Certain vendors also lowered their existing credit lines, restricted component product shipments, or requested letters of credit to secure credit lines. As a result, the Debtors were forced to use more of their cash, cash collateralize letters of credit or otherwise incur costs to provide credit enhancements.

On October 28, 2008, MPC received notice from Flextronics that it would not supply product or services under the MSA on grounds that MPC failed to meet its obligations under the MSA as a result of, among other stated reasons, its inability to provide assurances of its ability to further meet its obligations.

As of the Petition Date, Flextronics and certain of its affiliates assert that they are owed over $97 million by the Debtors. As more fully discussed below, the Debtors have commenced an adversary proceeding against Flextronics and certain of its affiliates whereby the Debtors assert various claims objections and claims for affirmative relief.

3.    The Debtors' Pre-Petition Funding

    *(a)    Wells Fargo*

On November 16, 2006, MPC Computers entered into an agreement with Wells Fargo Business Credit, Inc. ("Wells Fargo") for an accounts receivable assignment and advance facility (as amended, the "Receivables Advance Facility"). Under the facility, MPC Computers was authorized to assign to Wells Fargo, and Wells Fargo was authorized to purchase, certain accounts receivable (the "Accounts") and, in exchange, Wells Fargo would advance 90% of the value of the purchased Accounts.

Under the terms of the Receivables Advance Facility, Wells Fargo had the right to require that the Debtors repurchase the Accounts in the event the customer did not pay the receivable within a specified timeframe, if a material customer dispute arose or if there was an event of a default under the Receivables Advance Facility. Under the Receivables Advance Facility, Wells Fargo had discretion as to the Accounts purchased and the percentage advanced after submission of the Account for approval and was not obligated to buy any Account that it did not deem acceptable in its sole discretion.

On October 1, 2007, MPC-Pro and GCI, each entered into an account purchase agreement (the "Account Purchase Agreement") with Wells Fargo pursuant to which MPC-Pro and GCI could assign to Wells Fargo, and Wells Fargo could purchase, Accounts. In exchange, Wells Fargo agreed to advance to MPC-Pro and GCI 90% of the value of the purchased Accounts.

As security for the obligations under the Receivables Advance Facility and Account Purchase Agreement, Wells Fargo was granted a lien and security interest in the Debtors' assets. Pursuant to that certain Cross-Collateral and Cross-Default Agreement dated October 1, 2007, the obligations of each of the Debtors under the Receivables Advance Facility and the Account Purchase Agreement were cross-collateralized and cross-defaulted. The obligations thereunder were further guaranteed by the other Debtors.

In connection with the TSA, MPC-Pro, Gateway, GCI and Wells Fargo entered into an Intercreditor Agreement (the "Intercreditor Agreement"), which granted Gateway a junior security interest in accounts receivable generated on or after the October 1, 2007 acquisition of the Professional Business. Further, Wells Fargo and MPC-Pro agreed to set aside certain accounts receivable for the payment obligations under the TSA.

On June 24, 2008, Wells Fargo provided funding to MPC-Pro in the amount of $3 million (the "MPC-Pro Advance"), which was to be repaid on or before September 24, 2008 and was in addition to other amounts provided to the Debtors by Wells Fargo under the terms of the Receivables Advance Facility. As a condition of the MPC-Pro Advance, the Debtors were required to use the service of a strategic consultant approved by Wells Fargo.

In the weeks preceding the Petition Date, Wells Fargo purchased a relatively small number of Accounts and applied collections from both purchased Accounts and unpurchased Accounts to reduce its claims against the Debtors. As of the Petition Date, the Debtors' obligations to Wells Fargo under the Account Purchase Agreements were fully satisfied and Wells Fargo had indicated that it would not continue to purchase Accounts under the Account Purchase Agreements.

## IV. THE CASES

### A.  Summary of "First Day" Motions and Orders

Below is a summary of certain significant first day motions.

#### 1.  Motion to Use Cash Collateral.

*Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363(c)(2)(A) or, If Applicable, 361 and 363(c)(2)(B), and Federal Rule of Bankruptcy Procedure 4001 Authorizing Debtors' Use of Cash Collateral* (D.I. 7).

On the Petition Date, the Debtors filed their Motion to Use Cash Collateral pursuant to Gateway's prior grant of consent.  On November 7, 2008, Gateway filed its Limited Objection to the Cash Collateral Motion (D.I. 20), wherein Gateway requested that the Court condition the Debtors' use of Gateway's cash collateral on the Debtors' providing Gateway with adequate protection.  At the first-day hearing on November 10, 2008, the Court overruled Gateway's Limited Objection without prejudice, and entered an Interim Order Authorizing the Use of Cash Collateral and Scheduling a Final Hearing (D.I. 29).  On December 12, 2008, the Court entered a Final Order Authorizing the Use of Cash Collateral (D.I. 113).

#### 2.  Cash Management Motion.

*Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 345(b), Fed.R.Bankr.P. 2015 and Del.Bankr.L.R. 2015-2 for an Order (I) Authorizing and Approving Continued use of Cash Management System, (II) Authorizing Use of Pre-Petition Bank Accounts and Business Forms, (III) Authorizing Intercompany Transactions, and (IV) Waiving the Requirements of 11 U.S.C. 345(b) on an Interim Basis* (D.I. 11).

In an effort to lessen the disruption caused by the bankruptcy filings and maximize the value of their estates, the Debtors requested authorization from the Bankruptcy Court to continue to utilize the centralized cash management system, bank accounts and intercompany transaction practices, among other things, that had been in place prior to the Petition Date, as more particularly set forth in the Cash Management Motion.  On November 10, 2008, the Court granted the Debtors' request pursuant to the Order Pursuant to 11 U.S.C. §§ 105(a) and 345(b), Fed.R.Bankr.P. 2015 and Del. Bankr. 2015-2 (I) Authorizing and Approving Continued Use of Cash Management System, (II) Authorizing Use of Pre-Petition Bank Accounts and Business Forms, (III) Authorizing Intercompany Transactions, and (IV) Waiving the Requirements of 11 U.S.C. 345(b) on an Interim Basis (D.I. 32).  The Court entered an Amended Order on December 12, 2008 (D.I. 114).

<u>3.</u>    <u>Joint Administration Motion.</u>

*Debtors' Motion Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1 for Order Authorizing Joint Administration* (D.I. 3).

The Court granted the Debtors' request to authorize the joint administration, for procedural purposes only, of the Debtors' Chapter 11 Cases as set forth in the Order Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1 Authorizing Joint Administration. (D.I. 25)

<u>4.</u>    <u>Employee Wages and Benefits Motion.</u>

*Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 363 and 507(a) for an Order (I) Authorizing the Debtors, in Their Discretion, to Pay Certain Pre-Petition Employee Wages, Compensation and Employee Benefits and Continue Payment of Wages, Compensation and Employee Benefits in the Ordinary Course of Business; and (II) Authorizing the Debtors' Banks and Other Financial Institutions to Process, Honor and Pay Certain Checks Presented for Payment and to Honor Certain Fund Transfer Requests* (D.I. 15).

Pursuant to the Employee Motion, the Debtors requested authorization to pay certain obligations to employees that arose prior to the Petition Date. Specifically, the Debtors requested permission to pay earned, but unpaid prepetition wages and salaries, inclusive of withholding for payroll taxes, in an aggregate amount not to exceed $665,943.44 with no single employee receiving more than $10,950.00. Additionally, the Debtors requested authorization to reimburse employees for pre-petition business expenses in the maximum aggregate amount of $90,000 and pay and/or remit applicable accrued and outstanding tax obligations, other withholdings, employee benefit obligations, and medical, dental and prescription drug plan obligations, and other miscellaneous benefits. On November 10, 2008, the Court granted the relief requested in the Employee Motion upon the terms and conditions set forth in the Order Pursuant to 11 U.S.C. §§105(a), 363 and 507(a) Authorizing the Debtors, in Their Discretion, to (I) Pay Certain Pre-Petition Employee Wages, Compensation and Employee Benefits and Continue Payment of Wages, Compensation and Employee Benefits in the Ordinary Course of Business (D.I. 35).

<u>5.</u>    <u>Pre-Petition Customer Practices.</u>

*Debtors' Motion Pursuant to 11 U.S.C. § 105(a) for an Order Authorizing Debtors to Honor Pre-Petition Customer Practices* (D.I. 6).

Pursuant to the Customer Practices Motion the Debtors requested authorization to continue honoring, in their discretion, their customer practices, including but not limited to warranty and refund and return practices with respect to certain customers. The Debtors filed the Customer Practices Motion in order to sustain the loyalty and confidence of the Debtors' core customers and preserve the Debtors' businesses. On November 10, 2008 the Bankruptcy Court granted the Debtors' request as set forth in the Order Pursuant to Section 105(a) Authorizing Debtors to Honor Pre-Petition Customer Practices (D.I. 28).

6.     <u>Pre-Petition Tax Motion.</u>

*Debtors' Motion for Order Pursuant to 11 U.S.C. §§ 105(a), 363(b), 507(a)(8), and 541 Authorizing (I) Payment of Certain Pre-Petition Taxes, and (II) Financial Institutions to Process and Cash Checks and Transfers Related Thereto* (D.I. 12).

Pursuant to the Pre-Petition Tax Motion the Debtors requested approval to pay up to $1,063,278.68 on account of sales/use, excise, business and occupation taxes arising before the Petition Date. On November 10, 2008, the Court granted the relief requested in the Pre-Petition Tax Motion as set forth in the Order Pursuant to 11 U.S.C. §§ 105(a), 363(b), 507(a)(8) and 541 Authorizing (I) Payment of Certain Pre-Petition Taxes, and (II) Financial Institutions to Process and Cash Checks and Transfers Related Thereto (D.I. 33).

7.     <u>Critical Vendor Motion.</u>

*Debtors' Motion Pursuant to 11 U.S.C. §§ 105 and 363 for Order Authorizing the Payment of Certain Pre-Petition Claims of Certain Critical Vendors* (D.I. 8).

Pursuant to the Critical Vendor Motion, the Debtors requested authority to pay outstanding pre-petition claims, in an aggregate amount not to exceed $1,000,000, to certain vendors deemed critical to the Debtors' operations. The Critical Vendor Motion contemplated that any critical vendor or supplier receiving payment could be required, at the Debtors' discretion, to execute a trade agreement obligating such vendor or supplier to extend customary trade terms (consistent with the parties' pre-petition dealings) to the Debtors post-petition. On November 10, 2008, the Court authorized the relief requested as set forth in the Order Pursuant to 11 U.S.C. §§ 105(a) and 363 Authorizing the Payment of Certain Pre-Petition Claims of Certain Critical Vendors (D.I. 30).

8.     <u>Motion to Pay Carriers and Warehouses.</u>

*Debtors' Motion Pursuant to 11 U.S.C. §§ 105 and 363 for Order Authorizing the Payment of Pre-Petition Claims of Freight Forwarders, Shippers, Warehouses and Similar Claimants* (D.I. 13).

Pursuant to this Motion, the Debtors requested authority to pay outstanding pre-petition claims, in an aggregate amount not to exceed $1,900,000, to certain carriers and warehouses in order to (i) obtain the release of valuable inventory, (ii) maintain the Debtors' distribution system in an efficient manner, and (iii) induce critical carriers, shippers and support providers to continue to make timely deliveries of inventory. The Motion contemplated that any carrier of warehouse receiving payment could be required, at the Debtors' discretion, to execute a trade agreement obligating such vendor or supplier to extend customary trade terms (consistent with the parties' pre-petition dealings) to the Debtors post-petition. On November 10, 2008, the Court authorized the relief requested as set forth in the Order Pursuant to 11 U.S.C. §§ 105(a) and 363 Authorizing the Payment of Pre-Petition Claims of Freight Forwarders, Shippers, Warehouses and Similar Claimants (D.I. 34).

B.    Appointment of Committee

On November 21, 2008, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors. The following creditors were appointed to the Committee:

(a) Flextronics Computing Mauritius Limited;
(b) Quanta Computer Inc.;
(c) Document Storage Systems, Inc.;
(d) Technology Insurance Company;
(e) EMC Corporation;
(f) United Parcel Service; and
(g) H. Co Computer Products DBA Think CP Technologies.

The Bankruptcy Court also approved the retention of the following professionals to represent and assist the Committee in connection with these Chapter 11 Cases: Hahn & Hessen LLP, co-counsel to the Official Committee of Unsecured Creditors; Drinker & Biddle LLP, co-counsel to the Official Unsecured Committee of Creditors; and Mesirow Financial Consulting, LLC, financial advisors to the Official Committee of Unsecured Creditors.

C.    Retention of Professionals

At various times through the Chapter 11 Cases, the Bankruptcy Court has approved the retention of certain professionals to represent and assist the Debtors in connection with the Chapter 11 Cases. These professionals were intimately involved with the negotiation and development of the Plan. These professionals include, among others: Reed Smith LLP, general counsel to the Debtors; Landis Rath & Cobb, LLP, as conflicts counsel to the Debtors; Holland & Hart LLP, as special counsel to the Debtors; and Focus Management Group USA, Inc., as financial advisors to the Debtors.

The Bankruptcy Court also approved requests to retain other professionals to assist the Debtors in ongoing specialized matters. These professionals include, but are not limited to: Deloitte Tax LLP, as tax service provider to the Debtors and Ehrhardt Keefe Steiner Hottman PC, as accountants for purposes of auditing the Debtors' 401(k) plan. The Bankruptcy Court also approved the Debtors' request to retain Great American Group, LLC as auctioneer to assist the Debtors in their liquidation efforts.

D.    Orderly Liquidation

Despite the Debtors' best efforts to maintain their businesses as a going concern during these chapter 11 cases and find financing or a purchaser for substantially all of their assets, the Debtors ultimately determined that an orderly liquidation of their assets was in the best interests of all stakeholders. Accordingly, in consultation with the Committee, the Debtors formulated a strategy for an orderly liquidation of their assets with the intention of ultimately seeking confirmation of this chapter 11 Plan.

The Debtors' orderly liquidation strategy involved, *inter alia*, asset sales and collection of claims and accounts receivable. On January 23, 2009, the Debtors filed motions (collectively, the "Orderly Liquidation Motions") seeking authority to, *inter alia*, (i) retain an auctioneer and

conduct an auction sale of assets (D.I. 166), (ii) conduct *de minimis* asset sales and settle *de minimis* claims of the Debtors' estates in accordance with certain notice procedures (D.I. 167), and (iii) adopt and implement an employee incentive plan to incentivize the Debtors' remaining employees to maximize the recoveries for creditors in these cases (D.I. 168). On or about February 4, 2009, the Court entered Orders granting each of the Orderly Liquidation Motions.

      1.      Auction Sale

*Debtors' Motion Pursuant To 11 U.S.C. Sections 105(a), 327, 328, 330 And 363 For An Order (I) Authorizing Debtors To Enter Into Auctioneer Retention Agreement (II) Approving Retention And Employment Of Great American Group, LLC, And (III) Authorizing Asset Sales Free And Clear Of All Interests* (D.I. 166).

Pursuant to the Auction Sale Motion, the Debtors requested entry of an Order (i) authorizing the Debtors to enter into an Auctioneer Retention Agreement with Great American Group, LLC, (ii) authorizing the Debtors to retain and employ Great American as auctioneer to the Debtors pursuant to the terms of the Agreement, (iii) approving the terms and conditions under which Great American would be retained and compensated; and (iv) authorizing the Debtors to sell the Assets free and clear of all interests pursuant to 11 U.S.C. § 363(f). The Auction Sale Motion was necessary to accomplish the Debtors' auction sale of their inventory, equipment and other assets. On February 4, 2009, the Court entered an Order granting the Debtors' Auction Sale Motion.

On March 11-13, 2009, Great American conducted the Auction on behalf of the Debtors in accordance with the Court's Order. The auction sale generated in excess of $5 million in proceeds.

      2.      Collection of Accounts Receivable

*Debtors' Motion For An Order Pursuant To Bankruptcy Code Sections 105, 363 And 554 And Bankruptcy Rules 6004 And 9019 Approving Certain Procedures Governing (I) The Use, Sale Or Abandonment Of De Minimis Assets And (II) The Settlement Of Certain De Minimis Claims Of The Debtors' Estates* (D.I. 167).

Pursuant to this Motion, the Debtors sought authority to, *inter alia*, market and consummate sales of De Minimis Assets outside of the ordinary course of their business free and clear of all liens, claims and encumbrances and settle or compromise certain De Minimis Claims of the Debtors' estates pursuant to Bankruptcy Rule 9019 without further order of the Court but after notice to the Committee. On February 4, 2009, the Court entered an Order granting the Motion.

Since the Petition Date, the Debtors have been actively engaged in collecting accounts receivable. Once the Debtors decided to cease operations and engage in an orderly liquidation of assets under chapter 11, the Debtors focused efforts on collecting accounts receivable through litigation and by utilizing a collections agent. The Debtors utilized the de minimis settlement procedures set forth in the Court's Order to obtain automatic approval of settlements after notice to the Committee. The Court also granted numerous motions filed by the Debtors pursuant to

Federal Rule of Bankruptcy Procedure 9019 seeking approval of settlement of accounts receivable in excess of $100,000.

With respect to remaining outstanding accounts receivable, the Debtors have, as more fully set forth below, commenced numerous adversary proceedings seeking collection of such accounts receivable.

### 3. Employee Incentive Plan

*Debtors' Motion Pursuant To 11 U.S.C. Sections 105(a), 363(b)(1) And 503(c)(3) For An Order Authorizing The Debtors To Ratify, Adopt And Implement An Employee Incentive Plan* (D.I. 168).

Pursuant to the Employee Incentive Plan Motion, the Debtors requested authorization to adopt and implement an incentive plan for certain employees managing and conducting the Debtors' orderly liquidation efforts. On February 5, 2009, the Court entered an Order approving the Debtors' incentive plan.

Despite best efforts, the target amounts required to trigger the Employee Incentive Plan were not reached prior to the expiration of the applicable deadlines. Therefore, no payments have been made or will be made on account of the employee incentive plan.

### E. Debtor in Possession Operating Reports

Consistent with the operating guidelines and reporting requirements established by the United States Trustee (the "Guidelines") in these Chapter 11 Cases, the Debtors have satisfied their initial reporting requirements (D.I. 135), have filed Monthly Operating Reports[3] and will continue to file such Monthly Operating Reports as required by the Guidelines. Each Monthly Operating Report includes for the relevant period, among other things, (a) information regarding the Debtors' cash receipts and disbursements, (b) an income statement (prepared on an accrual basis), (c) a balance sheet (prepared on an accrual basis), (d) a statement regarding the status of the Debtors' post-petition taxes and (e) statement regarding the status of accounts receivable reconciliation and aging.

### F. Schedules and Statements of Financial Affairs

The Debtors filed their respective schedules of assets and liabilities (the "Schedules") and statements of financial affairs (the "SOFAs") with the Bankruptcy Court on April 3, 2009. (D.I. 302-310 and 312-320). The Schedules and SOFAs can be reviewed at the office of the Clerk of the Bankruptcy Court for the District of Delaware or can be obtained on the Claims Agent's website: http://www.loganandco.com.

---

[3] See Docket Items 214, 247, 265, 393, 394, 429, 502, 509, 552, 555 and 597.

G.    Claims Bar Date and Review Process

1.    Claims Bar Date

On April 9, 2009, the Bankruptcy Court entered an order (the "Bar Date Order") (D.I. 331) establishing May 29, 2009 as the bar date for all Persons and Entities to file pre-petition Claims in these chapter 11 Cases, including claims arising under Section 503(b)(9) of the Bankruptcy Code.  The Bar Date Order further provides that, among other things, any Person or Entity that is required to file a Proof of Claim in these chapter 11 Cases but fails to do so in a timely manner shall not be treated as a creditor with respect to such Claim for purposes of voting and distribution in these chapter 11 cases, and such Person or Entity shall not be permitted to vote to accept or reject any chapter 11 plan or participate in any distribution in the Debtors' chapter 11 cases on account of such claim.

2.    Claims Review and Objection Process

The Debtors have begun to evaluate the numerous Claims filed in these Cases to determine, among other things, the necessity for file objections seeking to disallow, reduce and/or reclassify such Claims.  The Debtors have engaged in a reconciliation of Claims against their Schedules in an effort to (a) eliminate duplicative or erroneous Claims and (b) ensure that the Bankruptcy Court allows only valid Claims.

On October 20, 2010, the Debtors filed their First Omnibus Objection (Non-Substantive) to: (I) Amended and Superseded Claims; and (II) Duplicative Claims Pursuant to 11 U.S.C. § 502, Fed.R.Bankr.P. 3007 and Del.Bankr.LR. 3007-1 (the "First Omnibus Objection"; D.I. 949). On November 12, 2010, the Debtors filed their Second Omnibus Objection (Non-Substantive) Pursuant to 11 U.S.C. § 502, Fed.R.Bankr.P. 3007 and Del.Bankr.LR. 3007-1 (D.I. 1143).  The Bankruptcy Court entered an Order granting the First Omnibus Objection in part on November 22, 2010 (D.I. 1171).

Pursuant to the Plan, upon the Effective Date, the Liquidating Trustee shall have exclusive authority to file objections, settle, compromise, withdraw or litigate to judgment objections to Claims on behalf of the Debtors.  If the Debtors or Liquidating Trustee, as applicable, objects to a Claim, a hearing regarding such objection will be held and notice of such objection and notice of the related hearing will be provided to affected Claim Holders as well as to other parties entitled to receive notice.  To the extent necessary, the Bankruptcy Court will rule on the objection and ultimately determine whether, and in what amount and priority, to allow the applicable Claim.  If the Debtors or Liquidating Trustee, as applicable, do not object to a Claim by the Objection Deadline, such Claim will be deemed Allowed and will receive the treatment accorded such Claim under the Plan.  As appropriate, the Debtors or Liquidating Trustee, as applicable, may seek to negotiate and/or settle disputes regarding a Claim or Claims as an alternative to filing objections to the allowance or treatment of such Claims.

H.    Litigation with Gateway, Inc.

1.    Background

In connection with the Gateway Acquisition and execution of the TSA, Wells Fargo, Gateway, Gateway Companies and MPC-Pro also entered into an intercreditor agreement (the "Intercreditor Agreement") pursuant to which Gateway Companies and MPC-Pro granted Gateway a security interest in certain of their personal property, subject and subordinate to the security interests granted to Wells Fargo under the Account Purchase Agreements.

As of the Petition Date, Gateway asserts claims approximating $16 million.  Gateway asserts that such claims are secured by liens on the assets of Gateway Companies and MPC-Pro to the extent provided in the Intercreditor Agreement.  The Debtors reserve all rights with respect to Gateway's asserted claims and are currently in the process of investigating potential avoidance actions and other claims against Gateway, relating to, *inter alia*, the Gateway Acquisition.

At various times subsequent to entering into the Intercreditor Agreement, the parties have executed certain amendments to the Intercreditor Agreement.  Most recently, on October 17, 2008, the parties entered into a Fifth Agreement Amendment (the "Fifth Amendment").  The Intercreditor Agreement and all amendments thereto are attached as Exhibit B to the Declaration of Curtis Akey in Support of Debtors' Chapter 11 Petitions and First Day Motions (the "Akey Declaration") (D.I. 14).

The Fifth Amendment provides, *inter alia*, that:

Gateway[, Inc.] consents to the use of cash collateral by Gateway Companies[, Inc.] and MPC[-Pro, LLC] during the course of any case with respect to these entities under Chapter 11 of Title 11 of the United States Code.

See Fifth Amendment, § 2, p.1.

2.    The Cash Collateral Motion and Gateway's Requests for Adequate Protection

On the Petition Date, the Debtors filed their Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363(c)(2)(A) or, if Applicable, 361 and 363(c)(2)(B), and Federal Rule of Bankruptcy Procedures 4001 Authorizing Debtors Use of Cash Collateral (the "Cash Collateral Motion").  On November 7, 2008, Gateway filed its Limited Objection to the Cash Collateral Motion (the "Limited Objection") (D.I. 20), wherein Gateway requested that the Court condition the Debtors' use of Gateway's cash collateral on the Debtors' providing Gateway with adequate protection.

At the first-day hearing on November 10, 2008, the Court overruled Gateway's Limited Objection without prejudice, and entered an Interim Order Authorizing the Use of Cash Collateral and Scheduling a Final Hearing (D.I. 29).  On December 12, 2008, the Court entered a Final Order Authorizing the Use of Cash Collateral (D.I. 113).

On December 10, 2008, Gateway filed its Motion for Adequate Protection (the "Adequate Protection Motion"), seeking adequate protection for the Debtors' use of its cash collateral pursuant to Section 363(e) of the Bankruptcy Code notwithstanding its prior grant of consent.

On January 12, 2008, the Debtors filed their Objection to the Adequate Protection Motion (the "Objection") (D.I. 143), in which the Committee joined. The Debtors' Objection to the Motion argues, *inter alia*, that Section 363(c)(2) provides for the use of cash collateral pursuant to either one of two logical alternatives: by consent, see § 363(c)(2)(A), or by providing adequate protection, see §§ 363(c)(2)(B) and 363(e) and that the Gateway's interpretation of the Fifth Amendment as reserving Gateway's right to seek adequate protection would render the agreement illusory.

> 3.    The Segregated Account

On January 27, 2009, the Court entered an Agreed Order Regarding (I) Establishment of Segregated Account for MPC-Pro, LLC Accounts and (II) Reservations of Rights of the Debtors and Gateway, Inc. (the "Agreed Order") (D.I. 177). The Agreed Order provided that "the Debtors shall deposit (i) all amounts received on account of receivables owned by MPC-Pro, LLC and (ii) all cash maintained in any deposit accounts owned by MPC-Pro, LLC into a deposit account in the name of MPC-Pro, LLC (the "Segregated Account")." See Agreed Order, § 1. The Agreed Order further restricted any use or access to the funds in the Segregated Account unless authorized by further Order of the Court and reserved all of the parties' rights with respect to the Segregated Account and funds therein. Id. at § 2-3.

On October 23, 2009, the Debtors filed their Motion for Authority to Use Funds in Segregated Account (the "Segregated Account Motion"; D.I. 585). The Motion sought authority to use the funds in the Segregated Account to pay intercompany administrative expense claims owed by MPC-Pro to MPC Computers pursuant to Gateway's consent (referred to as "Part A" of the Motion) and advanced alternative arguments attacking the extent and validity of Gateway's secured claim under, *inter alia*, Sections 552(a) and 552(b) of the Bankruptcy Code (referred to as "Part B" of the Motion).

> 4.    The Rule 2004 Examination of Gateway

In an effort to investigate potential claims against Gateway arising out of, *inter alia*, the Gateway Acquisition, on March 20, 2009, the Debtors filed the Debtors' Motion for an Order Pursuant to Federal Rule of Bankruptcy Procedure 2004 (I) Authorizing Examination of Gateway, Inc. and Gateway Technologies, Inc. and (II) Compelling Production of Documents [D.I. 296] (the "2004 Motion").

On April 23, 2009, the Court entered the Agreed Order Regarding the 2004 Motion (D.I. 423). Pursuant to that Order, Gateway was scheduled to begin producing documents on May 29, 2009. Prior to that date, the parties agreed to extend the document production pending settlement discussions.

Gateway ultimately began producing documents to the Debtors and the Committee in connection with the Rule 2004 examination in June 2010. The Debtors reviewed and analyzed the documents produced.

5.      The Motion to Convert

On May 1, 2009, Gateway filed the Motion to Convert. The hearing on the Motion to Convert has been continued a number of times while the parties held multiple discussion regarding the various Gateway issues in dispute.

6.      The Hearing on "Part A" of the Segregated Account Motion.

On December 23, 2009, this Court held a hearing on Part A of the Segregated Account Motion with respect to the issue of whether Gateway was entitled to adequate protection notwithstanding its unconditional grant of consent to the use of cash collateral in the Debtors' bankruptcy cases. Following the hearing, on December 29, 2009, the Court entered an Order (the "Segregated Account Order"; D.I. 680) holding that Gateway's consent to the use of cash collateral was fully binding and enforceable in the Debtors' bankruptcy cases.

On January 11, 2010, Gateway filed a Notice of Appeal from the Segregated Account Order (D.I. 693). On January 28, 2010, the Court entered an Order Staying Effectiveness of Order and Scheduling Discovery and Further Proceedings Regarding "Part B" of the Debtors' Motion for Authority to Use Funds in Segregated Account (D.I. 712).

Gateway's appeal (the "Appeal") from the Segregated Account Order to the United States District Court for the District of Delaware was stayed by agreement of the parties pending final adjudication of Part B of the Motion.

7.      The Gateway Adversary Proceedings

On June 9, 2010, Gateway commenced an adversary proceeding (10-51220 (PJW)) (the "Gateway Adversary") (D.I. 842) against the Debtors seeking, *inter alia*: (1) a declaration that $279,931.25 transferred by the State of California State Board of Equalization to the Debtors on or about July 2009 is not the property of the Debtors' estates and is held by the Debtors in a post-petition constructive trust for the benefit of Gateway; (2) the imposition of a constructive trust over such funds to prevent the unjust enrichment of the Debtors; (3) turnover of such funds to Gateway; and (4) a declaration that any remaining funds in the escrow account are not the property of the Debtors' estates.

On July 22, 2010, the Debtors filed their Answer, Affirmative Defenses and Counterclaims of the Debtors to Gateway, Inc.'s Complaint for Declaratory Relief and Turnover of Funds in the Gateway Adversary (the "Debtors' Answer and Counterclaims") (Gateway Adversary; D.I. 4). In the Debtors' Answer and Counterclaims, the Debtors asserted, *inter alia*, counterclaims seeking: (1) avoidance, pursuant to 11 U.S.C. § 547(b), of certain transfers to Gateway totaling $92,756.67; (2) recovery of such transfers pursuant to 11 U.S.C. § 550; (3) avoidance of the attachment of Gateway's security interest to assets of MPC-Pro or Gateway Companies by virtue of an after-acquired property clause or otherwise; and (4) disallowance of

the Gateway Claim until Gateway paid the Debtors an amount equal to all avoidable transfers received by Gateway.

On August 26, 2010, the Debtors commenced an adversary proceeding (10-52904 (PJW)) (the "MPC Adversary") (D.I. 906) against Gateway seeking, *inter alia*: (1) avoidance of Gateway's security interest in any assets or property of Gateway Companies as of the petition date and the proceeds thereof; (2) avoidance of Gateway's security interest in deposit accounts held by Wells Fargo Bank, National Association, and the proceeds thereof; (3) a declaration that Gateway's security interests did not attach to "equipment"; (4) a declaration that Gateway's claims against Gateway Companies are not secured claims; (5) a declaration that Gateway's prepetition and rejection damages claims against MPC-Pro relating to certain nonresidential real property leases are not secured claims; and (6) a judgment pursuant to 11 U.S.C. § 506(c) for all reasonable, necessary costs and expenses of preserving, or disposing of any collateral securing Gateway's secured claim, to the extent allowed.

8.    The Gateway Settlement

The Debtors, Gateway and the Committee agreed to mediate all pending disputes. After two full days of in-person mediation sessions and mediation efforts spanning several weeks, the parties reached a settlement of all of their existing disputes pursuant to the terms and conditions of that certain Mutual Settlement Agreement and Release dated October 1, 2010 (the "Gateway Settlement Agreement").

The Gateway Settlement Agreement includes, among others, the following terms:

(i)     a mutual general release of all claims of the opposing Parties;

(ii)    a settlement payment (the "Gateway Settlement Payment") by the Debtors to Gateway in the amount of Five Million, Six Hundred Fifty Thousand Dollars ($5,650,000);

(iii)   Gateway's entitlement to 45% of the net proceeds (less costs of collection including reasonable attorneys' fees) of the accounts receivable of MPC-Pro, obtained from May 31, 2010 until the entry date of a final decree in the Debtors' bankruptcy cases;

(iv)    the Debtors' assignment to Gateway of all warranty claims of the Debtors relating to extended warranties for Gateway-branded products sold prior to October 1, 2007; and

(v)     the allowance of Gateway's unsecured deficiency claim against the Debtors' estates in the initial amount of

$9,832,325.72, less the amount of proceeds of MPC-Pro's accounts receivable paid to Gateway.[4]

On October 4, 2010, the Debtors filed their Motion to Approve Compromise under Rule 9019 and Authorizing the Settlement Agreement By and Among Gateway, Inc., Gateway Technologies, Inc., the Debtors and the Official Committee of Unsecured Creditors (D.I. 939). On October 18, 2010, the Bankruptcy Court entered the Gateway Settlement Order (D.I. 947), approving the Gateway Settlement Agreement and authorizing the Debtors to consummate the Gateway Settlement Agreement and perform all actions required thereunder.

The Debtors have paid the Gateway Settlement Payment in accordance with the terms of the Gateway Settlement Agreement.

I.    Significant Pending Actions Commenced Against the Debtors

    1.    WARN Act Litigation

At certain times both prior to and subsequent to the Petition Date, one or more of the Debtors terminated employees. These terminations have resulted in two separate adversary proceedings wherein certain former employees of MPC-Pro have alleged that MPC-Pro violated the Worker Adjustment and Retraining Notification Act (the "WARN Act"). On November 7, 2008, two employees of MPC-Pro who were terminated prior to the Petition Date, Alice Price and James Laughlin, on behalf of themselves and purporting to act behalf of other allegedly similarly situated former employees, commenced an adversary proceeding against MPC-Pro, alleging violations of the WARN Act (the "First WARN Lawsuit"). The First WARN Lawsuit is styled as Price *et al.* v. MPC-Pro, LLC, Adv. Pro. No. 08-51802 (PJW) (Bankr. D. Del.). On January 6, 2009, two employees ~~of~~ of MPC-Pro who were terminated after the Petition Date, Dale Dear and Shane Schmidt, on behalf of themselves and purporting to act on behalf of other allegedly similarly situated former employees, commenced an adversary proceeding against MPC-Pro, alleging violations of the WARN Act (the "Second WARN Lawsuit" and, together with the First WARN Lawsuit, the "WARN Lawsuits"). The Second Warn Lawsuit is styled as Dear *et al.* v. MPC-Pro, LLC, Adv. Pro. No. 09-50006 (PJW) (Bankr. D. Del.).

The amount of priority claims held by the WARN Claimants has not been determined, but, if the WARN Claimants prevail in all respects in the WARN Litigation the claims asserted by the WARN Claimants in the WARN Litigation may include priority claims and General Unsecured Claims estimated to be, in the aggregate, approximately $7.5 million. The WARN Act also contemplates awards of attorneys' fees under certain circumstances.

---

[4] The terms set forth above have been identified solely for illustrative purposes. For a full understanding of the Gateway Settlement Agreement and its terms, interested parties are directed to review the Settlement Agreement attached as Exhibit A to the Gateway Settlement Order.

The Committee has intervened in the WARN Lawsuits. On My 27, 2010, the Bankruptcy Court entered a scheduling order in the WARN Lawsuits. Currently, discovery is ongoing and no trial dates have been set.

2.      <u>Adversary Proceeding Commenced by DSS, Inc. and Complete Medical Systems, Inc.</u>

On May 29, 2009, DSS, Inc. ("DSS") and Complete Medical Systems, Inc. ("CMS") commenced Adversary Proceeding No. 09-51001 against MPC-G, LLC and Wells Fargo Bank, N.A. seeking, *inter alia*, imposition of a constructive trust upon funds held by one or more of the Defendants as well as counts for: (i) mere conduit; (ii) earmarking; (iii) pass-through; (iv) imposition of an equitable lien; (v) breach of contract; (vi) improper and illegal dissipation of funds; (vii) accounting; (viii) indemnification/legal fees; and (ix) declaratory judgment that certain funds were never property of the MPC-G, LLC estate.

On January 13, 2010, upon Motion by MPC-G, LLC, the Court dismissed numerous counts of the complaint, leaving only the counts for imposition of a constructive trust, breach of contract and indemnification/legal fees). The remaining counts of the Complaint seeks imposition of a constructive trust in favor of CMS in the amount of $272,602.93 and in favor of DSS "in an amount to be determined and proven at trial."

On November 5, 2010, the Bankruptcy Court entered an amended scheduling order in this adversary proceeding. Currently, discovery is ongoing and no trial dates have been set.

J.      <u>Commencement of Adversary Proceedings by the Debtors and Committee</u>

The Debtors conducted an analysis of all payments and transfers made by the Debtors that could be potentially actionable under chapter 5 of the Bankruptcy Code as well as certain potential defenses available to the creditors that received those payments, including defenses based upon new value provided. The Debtors also conducted a review and analysis of unpaid accounts receivable that could not be resolved through the efforts of the Debtors or a third-party collection agency utilized by the Debtors.

On October 12, 2010, the Debtors and the Committee entered into the Stipulation By and Between the Debtors and the Official Committee of Unsecured Creditors Granting Authority and Standing to Pursue Certain Avoidance And Collection Actions, whereby the Debtors agreed to confer standing upon the Committee to pursue, on behalf of the Estates, certain designated avoidance and collection actions. On October 21, 2010, the Bankruptcy Court entered an Order approving the stipulation (D.I. 954).

On or prior to November 5, 2010, the Debtors and the Committee commenced approximately 173 adversary proceedings in the Bankruptcy Court seeking, *inter alia*, to avoid and recover transfers in an amount in excess of $41.3 million under Chapter 5 of the Bankruptcy and to collect accounts receivable of the Debtors in an amount in excess of $23.3 million. The Debtors have been attempting to collect the accounts receivable that are the subject of the Pending Adversary Proceedings throughout the course of the Bankruptcy Cases, including by utilizing a third-party collection agency and/or through demand letters by counsel, and believe that there may be significant difficulties associated with the collection of the accounts receivable

including, without limitation, assertions that the goods were non-conforming, delivered late and that warranties were not honored. As is routinely the case with avoidance and collection actions, the Debtors believe that the defendants will likely assert significant defenses that will substantially reduce the amount recoverable by the Bankruptcy Estate. Moreover, the Debtors expect that there may be collection problems associated with certain of the judgments obtained on account of these adversary proceedings. Accordingly, at this time, it is impossible to quantify with any level of certainty the likely return to the Bankruptcy Estates on account of the Pending Adversary Proceedings.

The Pending Adversary Proceedings include adversary proceedings commenced against Flextronics and certain of its affiliates, the United States Government and the South Dakota Entities. Each of the Pending Adversary Proceedings is still in the initial stages of litigation.

1.     The Flextronics Adversary Proceeding

a) Factual Background

Prior to the Petition Date, in April of 2008, the Debtors made the decision to cease manufacturing operations in Tennessee and to outsource manufacturing relating to Gateway branded products to Flextronics. On April 14, 2008, MPC Corp. and Flextronics entered into the MSA. Pursuant to the MSA, Flextronics agreed to adhere to a timeline associated with the transition of the Debtors' manufacturing operations to Flextronics' Juarez, Mexico manufacturing facility (the "Juarez Facility"). Flextronics and certain of its affiliates also agreed to perform in accordance with the terms of accepted purchase orders, including adhering to manufacturing specifications and delivery deadlines.

In connection with the transition of manufacturing to the Juarez Facility, Flextronics made representations to the Debtors regarding, *inter alia*, its (i) ability to perform under the MSA, (ii) ability to satisfy its contractual obligations to the Debtors, (iii) production capabilities at the Juarez Facility, (iv) ability to manufacture product at the Juarez Facility for the Debtors in a timely and efficient manner, and (v) ability to meet the deadlines in the Timeline. In reliance upon Flextronics' commitments and representations regarding, *inter alia*, its production capabilities and ability to successfully effectuate the transition of the Debtors' manufacturing to the Juarez Facility, the Debtors acted in furtherance of discontinuing their Nashville manufacturing operations, shutting down their Nashville manufacturing facility, and significantly reducing their manufacturing capabilities in Nampa, Idaho. By August of 2008, the Debtors had irreversibly shut down all operations at the Nashville manufacturing facility and significantly reduced their manufacturing capabilities in Nampa, Idaho. In connection with the Nashville shut-down, the Debtors had shipped, or were preparing to ship, a substantial portion of their production inventory to the Juarez Facility. As of the date of the Nashville shut-down, the Debtors were completely reliant on Flextronics for all manufacturing needs relating to Gateway-branded products.

Flextronics did not adhere to the Timeline as agreed. Contrary to its obligations under the MSA and its numerous representations regarding its ability to timely complete the tasks described in the Timeline, Flextronics repeatedly failed to complete action items by their agreed deadlines. During the months leading up to the Petition Date, Flextronics accepted a large

number of purchase orders from the Debtors, but regularly failed to perform in accordance with the accepted purchase orders.

As a result of Flextronics' breaches, very limited quantities of finished products were manufactured pursuant to the orders submitted and the Debtors developed a large backlog of orders. Due to the delays in production and fulfillment of orders, the Debtors experienced a large volume of order cancellations by its customers and lost customers. The breaches of Flex's contractual obligations and their direct effects materially impacted the Debtors' liquidity and caused a decline in sales, the substantial deterioration in the Debtors' working capital, the Debtors' bankruptcy filings, employee layoffs, and ultimately, the demise of the Debtors' businesses as a going concern.

### b) The Flextronics Claims

On May 28, 2009, Flextronics and six of its affiliates: (1) Flextronics Computer (Texas) Corporation; (2) Flextronics International Latin America (L), Ltd.; (3) Flextronics International Taiwan, Ltd.; (4) Flextronics Logistics USA, Inc.; (5) Flextronics International USA, Inc.; and (6) Flextronics Marketing (L) Ltd. (the "Flex Claimants") filed twenty-eight proofs of claim in the Debtors' cases (the "Flextronics Claims"). Each of the Flex Claimants filed four duplicative proofs of claim against MPC Corp., MPC Computers, MPC-Pro and Gateway Pro Partners. The Flextronics Claims assert claims based upon "unpaid accounts receivable under the MSA in the total amount of no less than $58,307,355.82" plus an additional "$38,877,836.35 for the value of inventory that was purchased by Claimant and its affiliates in connection with the production efforts under the MSA". The Flextronics Claims also assert additional unliquidated amounts.

The Flextronics Claims assert that $2,184,899.88 of the asserted accounts receivable claims are entitled to administrative priority pursuant to 11 U.S.C. §§ 503(b)(9) and 507(a)(2) (the "Flex 503(b)(9) Claims").

### c) The Flextronics Adversary Proceeding

On November 5, 2010, the Debtors commenced Adversary Proceeding No. 10-54652 against Flextronics and certain of its affiliates (the "Flextronics Defendants"). The Debtors' complaint asserts numerous affirmative claims for relief as well as objections to the Flextronics Claims.

The Debtors' affirmative claims for relief set forth in the Debtors' complaint include: (i) breach of contract based upon, *inter alia*, the Flextronics Defendants' failure to adhere to the timeline under the MSA and failure to perform in accordance with accepted orders placed the Debtors, resulting in significant damages to the Debtors; (ii) breach of contract seeking collection of outstanding accounts receivable owed by certain Flextronics Defendants of no less than $7,957,798.87 plus additional interest and reasonable attorney's fees and costs; (iii) avoidance and recovery of avoidable transfers pursuant to 11 U.S.C. § 547(b), 548 and 550(a) of no less than $3,357,994.24; (iv) equitable subordination of the Flextronics Claims pursuant to 11 U.S.C. § 510(c); and (v) avoidance and recovery of prepetition setoffs.

The Debtors' complaint against the Flextronics Defendants also asserts numerous objections to the Flextronics Claims. The Debtors' complaint seeks disallowance or reduction of

the Flextronics Claims based upon insufficient documentation, overstated claim amounts, ~~duplicatation~~duplication of claims, failure to account for the Debtors' rights of setoff and/or counterclaims, failure to mitigate, and Section 502(d) of the Bankruptcy Code. The Debtors' complaint also seeks disallowance of the Flextronics Claims based upon the fact that the Flextronics Claims are the result of Flextronics' own breaches of contract.

The Debtors also seek to have the Flex 503(b)(9) Claims treated as General Unsecured Claims based upon their failure to qualify for administrative priority under Section 503(b)(9) of the Bankruptcy Code. The goods giving rise to the Flex 503(b)(9) Claims were shipped directly to the Debtors' customers and therefore were never "received" by the Debtors as required for administrative priority treatment under Section 503(b)(9).

2. <u>The United States Government Adversary Proceeding</u>

On November 5, 2010, the Debtors commenced Adversary Proceeding No. 10-54703 against the United States of America and certain of its agencies and divisions (the "<u>US Government Defendants</u>"). The United States and/or certain of its agencies and departments filed a number of proofs of claim in the Debtors' bankruptcy cases (the "<u>Government Claims</u>") totaling in excess of $3.9 million. The Government Claims state, *inter alia*, that the Debtors and the Government entered into various contracts relating to the purchase by the Government of desktop and laptop computers and related equipment and service support. The Government Claims indicate that the United States and/or the Agencies owe money to the Debtors but assert a right of setoff based upon alleged breach of warranties in estimated amounts.

The Debtors' complaint against the US Government Defendants (the "<u>USA Complaint</u>") seeks collection of unpaid accounts receivable owed by certain of the US Government Defendants totaling in excess of $6.75 million plus additional interest accruing and reasonable attorney's fees and costs. The USA Complaint also seeks avoidance and recovery of preferential transfers totaling $72,291.55 pursuant to Sections 547 and 550 of the Bankruptcy Code. The USA Complaint also asserts objections to the Government Claims, seeking disallowance or reduction based upon insufficient documentation, overstated claim amounts and failure to account for the Debtors' rights of setoff and/or counterclaims, and Section 502(d) of the Bankruptcy Code. The USA Complaint also requests estimation of unliquidated and contingent Government Claims pursuant to Section 502(c) of the Bankruptcy Code.

3. <u>The State of South Dakota Adversary Proceeding</u>

On November 5, 2010, the Debtors commenced Adversary Proceeding No. 10-54708 against the State of South Dakota, certain of its agencies and certain school districts within South Dakota (collectively, the "<u>South Dakota Defendants</u>") asserting claims objections and affirmative claims for relief.

The State of South Dakota and certain of the South Dakota Defendants jointly filed proof of claim number 1080, as amended by proof of claim number 1394, asserting unsecured claims totaling $2,864,827.97 plus contingent claims in an unliquidated amount. Additional claims were filed by certain other South Dakota Defendants. The proofs of claim state, *inter alia*, that the Debtors and certain South Dakota Defendants entered into various contracts relating to the

purchase of desktop and laptop computers and related equipment and service support. Certain of the proofs of claims assert, *inter alia*, alleged breach of warranty obligations by the Debtors in contingent and unliquidated amounts.

The Debtors' complaint against the South Dakota Defendants (the "SD Complaint") seeks collection of unpaid accounts receivable owed by certain of the South Dakota Defendants totaling no less than $683,000 plus additional interest accruing and reasonable attorney's fees and costs. The SD Complaint also asserts objections to the proofs of claim filed by the South Dakota Defendants, seeking disallowance or reduction based upon insufficient documentation, overstated claim amounts and failure to account for the Debtors' rights of setoff and/or counterclaims. The SD Complaint also requests estimation of any unliquidated and contingent claims pursuant to Section 502(c) of the Bankruptcy Code.

K.    Administrative Claim Asserted by EMC Corporation

On April 10, 2009, EMC Corporation filed its proof of claim number 240, asserting administrative expense claims against one or more of the Debtors in the amount of $509,524.41 in addition to general unsecured claims.

L.    Tolling Agreement Relating to Potential Claims Relating to WARN Act

On or about October 27, 2010, the Debtors, the Committee, certain current and/or former directors and officers of the Debtors and special counsel to the Debtors entered into Tolling Agreements providing for the tolling through April 29, 2011 of applicable statute(s) of limitations governing actions relating to certain claims or conduct concerning the WARN Act. The Debtors do not believe that any meritorious claims exist against parties to the Tolling Agreement relating to the WARN Act.

M.    Current Status of the Debtors' Liquidation and Estimate Regarding Funds Available for Distribution

The Gateway Settlement Payment of $5,650,000 has been distributed to Gateway in partial satisfaction of Gateway's asserted secured claims pursuant to the Gateway Settlement Agreement and Gateway Settlement Order. As of the date of this Disclosure Statement, the amount of cash held by the Debtors' Estates totals approximately $9.5 million, including retainers held by Estate professionals. The Debtors believe that, depending on the outcome of certain litigation, all or substantially all of those currently held funds may be necessary to pay Holders of Administrative Claims (including Professional Fee Claims) and Priority Claims.

The Debtors expect to recover additional funds on account of the Pending Adversary Proceedings. As set forth above, the amount of proceeds that will be generated from litigation of the Pending Adversary Proceedings cannot be quantified with any level of certainty at this time. However, to the Debtors estimate that the Pending Adversary Proceedings, which assert claims with a face value of $64.6 million without consideration of any setoffs or defenses, could potentially generate net proceeds of approximately 5-15% of the face value of such claims. Collections of 5-15% of the face value of the claims asserted in the Pending Adversary Proceedings ($64.6 million) would result in Liquidation Proceeds in a range of approximately

$3.23-$9.69 million. Litigation involves inherent risks and therefore the amounts set forth herein are estimates only.

Of the total receivables outstanding, approximately $9.8 million are accounts receivable of MPC-Pro. Gateway is entitled to share in 45% of the net proceeds of MPC-Pro receivables pursuant to the Plan's treatment of Class 2 Gateway Secured Claims. The Debtors estimate that 45% of the net proceeds of the MPC-Pro receivables will be within a range of approximately $300,000 to $1.8 million. Under the Plan, all other net proceeds of the Pending Adversary Proceedings will be available to the Holders of Allowed Class 4 General Unsecured Claims.

The foregoing amounts payable on account of Class 2 Gateway Secured Claims are estimates only and could vary significantly based upon actual collections realized with respect to the MPC-Pro accounts receivable. A significant portion of MPC-Pro accounts receivable are accounts receivable which have been contested by the United States government and certain of its agencies and departments.

After conducting a preliminary analysis of the claims identified in the Schedules and the Proofs of Claims, the Debtors estimate that, based upon their books and records, there are likely to be Allowed General Unsecured Claims in an amount of approximately $100 million in these cases. In addition, there are claims asserting breaches of warranties in excess of $45.5 million that the Debtors believe are overstated and will ultimately be allowed in a substantially lower amount. The Debtors have not included any amounts asserted by Flextronics in the warranty claims or in the estimate set forth above. As set forth in detail above, the claims asserted by Flextronics in the amount of approximately $97 million are the subject of a Pending Adversary Proceeding that seeks, among other things, the disallowance or subordination of any claims asserted by Flextronics. The Debtors believe that Flextronics will contest the disallowance or subordination of the claims it has asserted.

## V.      SUMMARY OF THE PLAN

### A.      Overview of Chapter 11

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan is the principal objective of a chapter 11 case. A plan sets forth the means for satisfying claims against, and interests in, a debtor. Confirmation of a plan of by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan and any creditor of, or equity holder in, the debtor, whether or not such creditor or equity holder (a) is impaired under or has accepted the plan or (b) receives or retains any property under the plan. Subject to certain exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefore the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual and equitable right of the holders of claims or interests in classes are to remain unaltered by the reorganization effectuated by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan. Accordingly, it is not necessary to solicit votes from the holders of claims or equity interests in such classes. A chapter 11 plan also may specify that certain classes will not receive any distribution of property or retain any claim against a debtor. Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan. Any classes that are receiving a distribution of property under the plan but are not "unimpaired" will be solicited to vote to accept or reject the plan.

Section 1123 of the Bankruptcy Code provides that a plan shall classify the claims of a debtor's creditors and equity interest holders. In compliance therewith, the Plan divides Claims and Interests into various Classes and sets forth the treatment for each Class. The Debtors also are required under section 1122 of the Bankruptcy Code to classify Claims and Interests into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Classes. The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code, but it is possible that a Holder of a Claim or Interest may challenge the classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, the Debtors intend, to the extent permitted by the Bankruptcy Court and the Plan, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the accepting Holder is ultimately deemed to be a member. Any such reclassification could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

THE REMAINDER OF THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS ANY EXHIBITS THERETO AND DEFINITIONS IN THE PLAN).

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO IN THE PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO IN THE PLAN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS IN THE PLAN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS UNDER THE PLAN AND WILL, UPON THE OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS

IN, THE APPLICABLE DEBTORS, THE APPLICABLE DEBTORS' ESTATES, ALL PARTIES RECEIVING PROPERTY UNDER THE PLAN AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

B.     Purpose of the Plan

The Plan provides for the final liquidation of the Debtors' assets and distribution to creditors. The Debtors believe that the Plan provides the best and most prompt possible recovery to Holders of Claims. For purposes of this Disclosure Statement, the term Holder refers to the holder of a Claim or Equity Interest in a particular Class under the Plan. If the Plan is confirmed by the Bankruptcy Court and consummated, on the Effective Date or as soon as practicable thereafter, the Debtors will make distributions in respect of certain Classes of Claims as provided in the Plan. The Classes of Claims against, and Interests in, the Debtors created under the Plan, the treatment of those Classes under the Plan and distributions to be made under the Plan are described below.

C.     Classification And Treatment Of Claims And Interests

1.     Summary of Unclassified Claims

(a)     Administrative Claims

The Liquidating Trustee shall pay each Holder of an Allowed Administrative Claim (excluding Professional Fee Claims) the full amount of such Allowed Administrative Claim, without interest, in Cash, as soon as practicable after the later of: (i) the occurrence of the Effective Date, or (ii) the date such Administrative Claim becomes an Allowed Claim. Notwithstanding anything in the Plan to the contrary, a Holder of an Allowed Administrative Claim may be paid on such other date or dates and upon such other less favorable terms as may be agreed upon by such Holder and the Liquidating Trustee. Without limiting the foregoing, all outstanding fees payable to the Office of the United States Trustee under 28 U.S.C. § 1930 that have not been paid as of the Effective Date, shall be paid by the Liquidating Trustee no later than thirty (30) days after the Effective Date, or when due in the ordinary course, pending entry of a Final Decree.

Each Holder of an Administrative Claim or Substantial Contribution Claim (excluding Professional Fee Claims) must file an Administrative Claim Request or request for a Substantial Contribution Claim with the Bankruptcy Court prior to the Administrative Bar Date.

The Liquidating Trustee shall pay Professionals who are entitled to reimbursement or allowance of fees and expenses from the Debtors' Estates pursuant to Bankruptcy Code §§ 503(b)(2) - (b)(6), in Cash, in the amount awarded to such Professionals by Final Order of the Bankruptcy Court, as soon as practicable after the later of (i) the Effective Date, and (ii) the date upon which any order awarding fees and expenses becomes a Final Order, in accordance with the terms of any order entered by the Bankruptcy Court governing the payment of fees and expenses